**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

-------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| SEA CONTAINERS LTD., et al.,[1] | Case No. 06-11156 (KJC) |
| Debtors. | Jointly Administered |

-------------------------------------------------------x

**SUMMARY OF FINAL APPLICATION BY AP SERVICES, LLC
FOR APPROVAL OF CONTINGENT SUCCESS FEE AND
FINAL APPROVAL OF FEES AND EXPENSES**

| | |
|---|---|
| Name of Applicant: | AP Services, LLC ("APS") |
| Authorized to Provide Professional Services to: | Sea Containers Ltd. |
| Date of Retention: | May 8, 2007, *nunc pro tunc* to April 2, 2007 |
| Amount of Contingent Success Fee | £500,000 (USD $709,450.00) |
| Amount of Final Fees and Expenses | USD $7,309,411.73 |

This application (the "Application") is for final approval of the Fees, including the Contingent Success Fee (as defined in APS' engagement letters with the above-captioned debtors (the "Debtors")). By order dated May 8, 2007 (the "Retention Order"), this Court authorized the retention of APS pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"). APS previously has submitted monthly compensation and expense reimbursement reports for the period from the commencement of its engagement through the confirmation date of the Debtors' plan of reorganization (May 8, 2007 through November 24, 2008). This Application seeks final approval of the Contingent Success Fee and final approval of all other fees and expenses of APS in this case.

---

[1]    The Debtors are Sea Containers Caribbean Inc., Sea Containers Ltd. and Sea Containers Services Ltd.

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

In re:

SEA CONTAINERS LTD., et al.,[2]

                Debtors.

Chapter 11

Case No. 06-11156 (KJC)

Jointly Administered

-------------------------------------------------------x

### FINAL APPLICATION BY AP SERVICES, LLC FOR
### APPROVAL OF CONTINGENT SUCCESS FEE AND
### FINAL APPROVAL OF FEES AND EXPENSES

AP Services, LLC ("APS"), crisis managers to Sea Containers, Ltd. and its affiliated debtors in the above-captioned cases (collectively, the "Debtors"), hereby submits this application (the "Application"), for allowance of the fees and expenses, including the contingent success fee ("Contingent Success Fee") provided for in its Engagement Letters, as hereinafter defined, and respectfully represents as follows:

### PRELIMINARY STATEMENT

APS is entitled to the Contingent Success Fee in light of APS' substantial contribution to the successful restructuring of the Debtors' global businesses including its core maritime container leasing business.  Laura Barlow, a managing director of AlixPartners and an authorized representative of APS, provided critical interim management services to Sea Containers, Ltd. ("SCL"), the Debtor and ultimate parent company to each of the other Debtors and the non-debtor subsidiaries, by acting as Chief Restructuring Officer ("CRO") and Chief Financial Officer ("CFO") of the Debtors.  Ms. Barlow and employees of APS under her supervision, mostly resident in APS' London offices, were able to

---

[2]    The Debtors are Sea Containers Caribbean Inc., Sea Containers Ltd. and Sea Containers Services Ltd.

drive the Debtors' United States ("US") and Bermuda restructuring efforts and manage the Debtors'

financial, treasury and tax functions, from the Debtors' administrative offices in London, England.

The fee structure that APS provided to Debtors in these cases permitted Debtors to

realize the services of Ms. Barlow and her team at a substantial discount from what APS would

otherwise have charged for services rendered by its employees in the United Kingdom ("UK")

providing services in the UK. APS' standard practice for US engagements is to charge for work

performed outside the United States at local rates in that jurisdiction converted to US dollars. In this

case, APS agreed to flat monthly rates for Ms. Barlow and two other full-time employees, which

resulted in savings to the Debtors of approximately $1.3 million compared to hourly fees at standard

UK rates. The Contingent Success Fee was an integral part of the compensation arrangements agreed

with the Debtors and was contingent on confirmation of the Plan of Reorganization (the "Plan") and

successful disposition of the majority of the group's non-core assets. The Contingent Success Fee was

approved by the Board of Directors (the "Board") of SCL on November 18, 2008.

Moreover, the Contingent Success Fee is particularly warranted here given that APS

provided substantial and measurable value to the Debtors and their estates by playing an integral role

in the following:

- Confirmation of a complex Plan involving ancillary proceedings in Bermuda and the UK;

- The Debtors' procurement of a $145 million debtor in possession facility, including testimony in support thereof, which prevented the loss of key container assets from the estate;

- The Debtors' procurement and timely consummation of their $127 million exit financing facility to refinance the DIP facility;

- The negotiation of the Pension Schemes Settlement Agreement, which resulted in a reduction in multiple claims against the Debtors each of approximately $226 million to a single claim of $194 million against SCL only, enabled the release of tens of millions of dollars of trapped cash from non debtor subsidiaries and facilitated the Plan;

- The negotiation of a critical settlement with General Electric regarding the ownership and governance of the joint venture, GESeaCo, the most valuable asset of the Debtors' estates. This brought to an end the protracted and costly litigation between SCL and General Electric, allowing the Plan to be consummated and preserving significant value for the estates;

- Supervising the disposal and/or liquidation of non-core subsidiaries and assets generating value in excess of $200 million, streamlining the group structure and substantially reducing central costs.

Each of these extraordinary efforts directly contributed to the success of the Debtors' reorganization in a demonstrable fashion.

Finally, performance fees are part of the normal compensation structure for APS and other interim management firms both inside and outside of bankruptcy. As such, and given APS' exceptional performance in this case, APS respectfully submits that the Court should approve the Contingent Success Fee, in addition to final approval of APS' other fees and expenses.

## INTRODUCTION

1.      On October 15, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). APS has served as crisis managers to the Debtors and as Chief Restructuring Officer and Chief Financial Officer of the Debtors, all pursuant to an order entered by this Court on May 8, 2007 at docket item number 589 (the "Retention Order"), a copy of which is attached hereto as **Exhibit A**.

2.      The Retention Order approved the engagement letter entered into between APS and the Debtors on April 2, 2007 as amended (the "Engagement Letter"). Copies of the Engagement Letter along with amendments are attached hereto as **Exhibit B**. The Engagement Letter provided that Ms. Barlow as CRO and CFO for the Debtors, along with two temporary employees, Craig Cavin and Lisa Ashe, would work for the Debtors at fixed monthly rates in British pounds. These fixed monthly rates provided the Debtors a significant discount from APS'

standard UK rates.  APS has determined that the savings to the Debtors approximates $1.3 million dollars.

3.      Pursuant to paragraph 2 of Schedule 1 of the Engagement Letter, the Debtors agreed that, in addition to the monthly and hourly fees payable for the services it provided, APS would be compensated for its efforts by payment of the Contingent Success Fee, which the Company understood and acknowledged as an integral part of APS' compensation for the engagement.  The Engagement Letter provided that the Contingent Success Fee would be a one-time fee of £500,000 payable upon achievement of the objectives under the Engagement Letter.  See Schedule 1, ¶ 2 to the Engagement Letter.[3]

4.      The intent of the Contingent Success Fee was not only to compensate APS for its substantial fee concessions in these cases, but also to reward APS for driving the engagement to a successful conclusion via a confirmed chapter 11 plan of reorganization.  The Contingent Success Fee was agreed to not only in the Engagement Letter, but in a Board meeting subsequent to confirmation of the Debtors' chapter 11 plan.

5.      Throughout these cases, APS has been paid monthly and hourly fees, and reimbursed for expenses, for each monthly period and has filed all quarterly fee reports relating to these fees and expenses as outlined in the Retention Order.  No objections have been received to any quarterly fee report, other than those of the fee auditor which APS has worked in good faith to resolve.  As of the Application date, in response to reports from the fee auditor, AlixPartners agreed to voluntary reductions totalling $3,442.08 in expenses from the total expenses incurred of $41,222.35, leaving a remaining expense incurred total of $37,780.27 for the fee application

---

[3]     Court approval of the Contingent Success Fee was deferred pursuant to the terms of the Retention Order, which provides, in relevant part, that approval of the Contingent Success Fee is subject to further order of the Court (after notice and a hearing) and is to be determined based on reasonableness.

period of April 1, 2007 through November 30, 2008. The final fee auditor report for the eighth fee period has not been filed with court.

6.     On November 24, 2008, this Court entered an order (the "Confirmation Order") confirming the Fourth Amended Joint Plan of Reorganization of the Debtors and Debtors in Possession (the "Plan"), and the Plan was effective on February 11, 2009. The Debtors thereafter filed and served a Notice of Effective Date of Fourth Amended Joint Plan of Reorganization of Debtors and Debtors in Possession dated February 11, 2009.

7.     The services of APS were integral to the reorganization of the Debtors and contributed significant direct and incremental value to stakeholders. APS' services included not only the provision of management, in the form of both a CFO and a CRO, to the Debtors in these cases, but the provision of services that were essential in preparing, negotiating and ultimately obtaining confirmation and consummation of the Plan and significantly reducing claims against the Debtors' estate. Consistent with the terms of the Engagement Letters, and as a result of the extraordinary results achieved by APS in these cases and the fee concessions made by APS, APS is entitled to the Contingent Success Fee of £500,000.

8.     APS respectfully requests that this Court enter an order allowing the Contingent Success Fee in the amount of £500,000 as set forth herein and in the Declaration of Laura Barlow (the "Barlow Declaration") attached hereto as **Exhibit C.**

9.     In addition, APS seeks final approval of all fees and expenses previously paid to APS in this case and reported in its quarterly compensation reports. A summary of the fees and expenses paid to APS in the case for the period from April 2, 2007 through November 24, 2008 is attached hereto as **Exhibit D**.

## CRISIS MANAGEMENT SERVICES PROVIDED TO THE DEBTORS

10. The services that APS has performed were substantial and necessary in these chapter 11 cases, and added material additional value beyond the amount that results from a simple application of the lodestar approach, as explained below. APS performed such services with the minimum amount of duplication with the Debtors' other advisors. APS segregated time billings for its services into various categories in this case including CFO and CRO activities, interim management services, interim restructuring services, plan of reorganization and travel.

## SIGNIFICANT PROFESSIONAL SERVICES RENDERED

11. The services APS provided contributed significant value to the Debtors and were integral to the Debtors' emergence from chapter 11. The following is a summary of significant professional services rendered by APS to the Debtors during the pendency of their chapter 11 cases.

**Corporate Governance**
- Attendance at all Board meetings and Board teleconference calls
- Reporting to the Board on key operational and restructuring issues, including Debtor-in Possession financing facility (the "DIP"), progress on the Plan, settlement with General Electric regarding the container leasing joint venture, GESeaCo and UK Pension issues
- Updating the directors of non-debtor entities and assisting with analysis in relation to the inter-company debt position, group simplification and cash repatriation to SCL

**Chief Financial Officer Responsibilities**
- Review and approval of Monthly Operating Report for Debtors
- Oversight of financial reporting function
- Oversight of Treasury function and cash management
- Oversight of taxation matters

**Debtor in Possession (DIP) Financing**
- Negotiation and evaluation of alternative financing options with existing securitization lenders and DIP lenders
- Negotiation of term sheet and commitment letter for DIP financing
- Negotiation of Credit Agreement and ancillary documents
- Testimony to the Bankruptcy Court at the DIP hearing in support of the DIP motion, including deposition and direct testimony
- Satisfying reporting requirements under the DIP
- Updating counsel to the DIP lenders on Plan status and key developments
- Obtaining consents from DIP lenders as required on restructuring related matters

**Plan of Reorganisation**
- Development of Plan structure and term sheet in conjunction with the Debtors' advisors
- Communication with the Creditors' Committees and discussion of proposed terms
- Oversight of Plan development including update of Entity Priority Model, group simplification initiatives and financing options
- Ongoing discussions with the Pension Trustees and the Pension Regulator in the UK
- Oversight of Disclosure Statement preparation
- Retention and interaction with experts in connection with Plan Valuation
- Oversight of review of executory contracts
- Oversight of Plan implementation strategies including Bermuda and UK implementation
- Oversight of review of avoidance actions

**Non-core asset disposals**
- Oversight of asset disposal process including review of proposed transactions and terms, discussion with subsidiary directors regarding disposal strategies and use of proceeds, understanding disposal tax matters, review of the sale and purchase agreement, managing due diligence requests and negotiation with purchasers.
- Negotiation of terms for retention of advisors to assist in non-core asset disposal process
- Management of Illustrated London News Group and Fairways & Swinford business disposals (including preparation of Information Memorandum, solicitation and negotiation of offers and final contract negotiation)
- Liaison with PricewaterhouseCoopers as tax and pensions advisers to the debtors
- Preparation of briefing papers, discussions and communications with the Creditors' Committees in relation to the asset disposal programme
- Day to day management of:
    - Vollman Brothers, M&A advisers, in relation to disposal of SuperSeaCat, YMCL, PCML and CMCI
    - Societe Generale, M&A advisers, in relation to disposal of SeaStreak ferry operation
    - 333 Capital in relation to disposal of IRS.
    - PwC Greece in relation to disposal of Corinth Canal interests
- Completion of the following business and share disposals:
    - the SeaStreak ferry operation, Charleston Marine Container and SeaCo Parts (all based in the USA)
    - Independent Reefer Services and International Reefer Services based in Australia and New Zealand
    - Helsinki Tallinn business and SuperSeaCat 3 and SuperSeaCat 4 disposals.
    - Brasiluvas (Brazilian grape farm) and Santos Tank (based in Brazil)
    - Societe Bananiere de Motobe
    - Tallinn shares

**SeaContainers House**
- Review of proposed settlement terms, analysis of alternative options and presentation to Committees

- Oversight of relocation from SeaContainers House

**Claims Against the Estates**
- Oversight of claims review and investigation process
- Company interface on noticing requirements with respect to the claims bar date.
- Discussions with counsel in relation to claims potentially requiring early settlement (and court approval)
- Oversight of process to address potential equalization and/or employee claims
- Leading settlement negotiations with other unsecured creditors

**Pension Settlement Agreement**
- Negotiation of Pension Schemes Settlement and review / oversight of detailed settlement documentation
- Oversight of regulatory approval process including the Pensions Regulator in the UK and 9019 procession in the Bankruptcy Court including responding to discovery requests by Sea Containers Limited ("SCL") Committee.
- Testimony in connection with the contested pension settlement hearing
- Oversight of implementation of the pension settlement including Schemes of Arrangement for Sea Containers Services Limited and other participating employers in the Schemes

**GE SeaCo and GECC**
- Oversight of claims arbitration process and facilitation of discovery requests
- Lead negotiations with GE and GE SeaCo on a framework agreement to settle all claims between the parties and SCL and its subsidiaries
- Lead communications with both Creditors' Committees, DIP lenders and ad hoc bondholders regarding the proposed framework agreement
- Oversight of negotiations with GE and GE SeaCo on detailed documentation of the framework agreement to settle all claims between the parties and SCL and its subsidiaries
- Lead negotiation to ensure consistency between exit financing requirements and joint venture contractual obligations

**Exit Financing**
- Negotiation and evaluation of exit financing options with potential exit lenders
- Lead negotiation of term sheet and commitment letter with potential exit lenders
- Project management of due diligence process for exit lenders
- Lead negotiation of final facility documentation
- Project management of closing process

**Cash Management**
- Monitoring the cash needs of the Debtors' estates and obtaining approval for the funding of non-debtor entities to maximize the proceeds from the sale of non-core assets
- Oversight of the treasury function
- Overseeing assessment of cash needs of non-debtor subsidiary businesses
- Monitoring of cash forecasts, review of all payments made from by the debtors including detailed review of professional advisors' fee applications

- Developed and implemented cash repatriation process to accelerate the repatriation of asset disposal proceeds to the debtors

**Case Management / Communications**
- Lead regular communications with both Committees and their professional advisors
- Oversight of work performed by professional advisors, review of fee submissions, monitoring of actual and forecast expenditure on the case
- Review of public communications (8k, press releases etc)

**Human Resources**
- Direct responsibility for finance team (Financial Reporting, Treasury and Tax)
- Review of Key Employee Retention Plan and presentation to Committees
- Regular communications to all employees through update meetings
- Oversight of planned head count reduction including managing the exit and transition of responsibilities of senior managers
- Communications with employees with regard to the claims bar date, restructuring process and resolution of employee claims

**Corporate Structure**
- Development of a framework to consider the rationalization of the corporate structure of the SCL group and the various options for achieving a simpler structure
- Identification of options and impediments to the implementation of a simpler group structure and development of a methodology to achieve the rationalization in the context of the Plan
- Oversight of implementation of group simplification initiatives in Australia, UK and Bermuda

## SUCCESS FEES ARE TYPICAL IN CASES SUCH AS THESE

12.    Performance fees or success fees are normal parts of compensation for turnaround firms and management restructuring consulting firms, and are standard for APS' engagements of this type, both inside and outside of bankruptcy courts. Indeed, firms like APS, and APS in the Debtors' case, price their engagement and the size of the performance or success fee as part of the total compensation package. Thus, APS and firms like it rely upon and take into account the negotiated performance or success fee when accepting work. If APS and other firms were denied this integral component of their compensation package, it likely would result in one of two scenarios -- either they would not accept the work or they would increase their monthly

and hourly fees.  The former is not an acceptable result, as it would deny distressed companies the

necessary services of firms like APS that specialize in supplying senior executives to financially

troubled companies and enjoy a national and international reputation for their expertise in

financial reorganizations and restructurings of troubled companies.  The latter also is not a

desirable result, as it would needlessly result in increased fees during the pendency of the case,

without such fees being tied to a successful confirmation or other negotiated performance-based

criteria.  In recognition of these realities, courts routinely authorize and approve the payment of

performance fees and success fees.

13.    As the Bankruptcy Court in the Southern District of Ohio held in *In re
Cardinal Indus., Inc.*, 151 B.R. 843 (Bankr. S.D. Ohio 1993) (Chapter 11 operating trustee

awarded APS a fee of $2.1 million plus a success fee of 50,000 shares of stock):

> Performance-based or success-factor bonuses are a normal part of
> compensation arrangements for management restructure consultants
> and ... such bonuses generally far exceed the time value of the
> consultant's services on a lodestar basis.  Indeed, the time value
> component is referred to as the base salary, apparently payable to
> the consultant even if success is not achieved.

*In re Cardinal Indus., Inc.*, 151 B.R. at 847

14.    When Congress passed the Bankruptcy Reform Act of 1978, it decided to

remove the "spirit of frugality" as a factor in bankruptcy fees.  The standard is now the cost of

comparable services in a non-bankruptcy setting.  Inasmuch as success fees are a normal part of

APS' fee structure, both within and outside of bankruptcy, approval of the Contingent Success

Fee is appropriate to assure comparable compensation for comparable services.

15.    Recent bankruptcy success fees, proposed or awarded to other persons or

firms include the following:

- **Enron Corp.**, a Chapter 11 case in the Southern District of New York. Stephen F. Cooper, of the turnaround firm Kroll Zolfo Cooper LLC, applied to the Bankruptcy court for a $25 million success fee for his services as Debtor's interim chairman. Cooper later agreed to reduce his request to $12.5 million, and this reduced fee was approved. In re Enron Corp., 2006 WL 1030421 (Bankr. S.D.N.Y. 2006).

- **Northwestern Corp.**, a Chapter 11 case in the District of Delaware. Lazard Freres & Co. LLC, financial advisor to the Debtor, was awarded a transaction (or success) fee of $2.75 million, "which brings it in line with the transaction fee of the financial advisors employed by the Official Committee of Unsecured Creditors." In re Northwestern Corp. 324 B.R. 538, 547-48 (Bankr. D. Del. 2005), rev'd, 344 B.R. 40 (D. Del. 2006) (it was error to reduce the success fee; full $5.5 million awarded).

- **Warnaco**, a Chapter 11 case in the Southern District of New York. Tony Alvarez, of the firm Alvarez & Marsal, who was Debtor's interim CEO, was awarded a success fee of $2.25 million. Warnaco Proxy Statement, filed April 2003.

- **Farmland Industries**, a Chapter 11 case in the Western District of Missouri. Houlihan Lokey Howard & Zukin Financial Advisors, Inc., financial advisors for the Unsecured Creditors Committee, was awarded a success fee of 1% of the amount distributed to unsecured creditors, with a minimum guaranty of $1 million and a cap of $3 million. In re Farmland Industries, Inc., 286 B.R. 895, 897, n.1 (Bankr. W. D. Mo. 2002).

- **Calpine Corporation**, a Chapter 11 case in the Southern District of New York. APS was crisis manager to the Debtors and was awarded a success fee of $6.0 million.

- **Dana Corporation**, a Chapter 11 case in the Southern District of New York. APS was crisis manager to the Debtors and was awarded a success fee of $4.0 million.

- **Dura Corporation**, a Chapter 11 case in the District of Delaware. AlixPartners was financial advisor to the Debtors and was awarded a success fee of $2.1 million.

16.     Other reported decisions awarding success fees to firms that were not law firms or accounting firms include *Kaufman v. S and C Corp.*, 171 B.R. 38 (S.D. Texas 1994) (management company that operated hotel entitled to a success fee of $212,417 for fiscal year 1992); *In re Intelogic Trace, Inc.*, 188 B.R. 557 (Bankr. W.D. Texas 1995) (awarding consultant a success fee of $77,500 based on a percentage of the sale price of Debtors' assets plus hourly fees of $24,880 based on a rate of $200 per hour); *In the matter of Chicago, Milwaukee, St. Paul and*

*Pacific Railroad Co.*, 841 F.2d 789 (7th Cir. 1988) (investment banking firm awarded $1 million success fee).

17.    In short, success or performance fees are a normal part of compensation for firms such as APS, which provide crisis management and turnaround services to debtors, and may be approved on that basis alone.  In addition, however, approval of the Contingent Success Fee in these cases is particularly warranted because the services provided by APS resulted in real, demonstrable and significant incremental value to the Debtors and their estates.  These efforts and contributions were a key enabler of the successful outcome of these proceedings.

18.    The results achieved in these cases were outstanding given the circumstances that faced the Debtors at the commencement of these cases and at the time APS was retained, including extensive litigation with General Electric, a securitization of the container assets that was under immediate threat of enforcement by the lenders and proceedings against SCL by the UK Pensions Regulator on behalf of the UK Pension Schemes.  In addition, the very challenging economic conditions made it very difficult to obtain exit financing.  Although the efforts of APS are not the sole cause of such success, and the efforts of the Debtors and their other professionals also were extraordinary under the circumstances, briefly highlighted below are just three of the many services provided by APS that demonstrate the reasonableness of the Contingent Success Fee.

- The Debtors' procurement and timely consummation of their $127 million exit financing facility to refinance the DIP facility;

- The negotiation of the Pension Schemes Settlement Agreement which resulted in a reduction in multiple claims against the Debtors each of approximately $226 million to a single claim of $194 millionagainst SCL only, , enabled the release of tens of millions of dollars of trapped cash from non debtor subsidiaries and facilitated the plan of reorganization;

- The negotiation of a critical settlement with General Electric regarding the ownership and governance of the joint venture, GESeaCo, the most valuable asset of the Debtors' estates. This brought to an end the protracted and costly litigation between SCL and General Electric, allowing the Plan of Reorganization to be consummated and preserving significant value for the estates.

19.    In short, because the Engagement Letter provides for the payment of the Contingent Success Fee, such fee is a normal part of APS' compensation structure both inside and outside of bankruptcy, and the extraordinary results of these cases largely have been driven by APS, approval of the Contingent Success Fee is both warranted and appropriate. Accordingly, this Court should approve APS' request for payment of the Contingent Success Fee.

20.    The Barlow Declaration supports this request. The Barlow Declaration shows that APS and other turnaround firms regularly require and receive success fees as part of their normal compensation structure, both inside and outside of bankruptcy cases.

21.    Finally, APS respectfully requests that this Court enter an Order providing that all of its fees and expenses in this case, as outlined on attached **Exhibit D**, are approved as final.

23.    Notice of the Application has been or will be provided to those parties entitled to receive notice hereof in accordance with the provisions of the Confirmation Order.

## **CONCLUSION**

WHEREFORE, APS respectfully requests that this Court enter an order awarding APS

a final allowance of its Contingent Success Fee in the amount of £500,000 and its other fees and

expenses as outlined on Exhibit D, and such other and further relief as is just or appropriate.


Dated: March 31, 2009
AP Services, LLC
2000 Town Center, Suite 2400
Southfield, MI 48075


By      */s/ Laura Barlow*_____
      Laura Barlow
      Authorized Representative
      AP Services, LLC

## SUMMARY OF EXHIBITS

A       Retention Order

B       Signed Engagement Letter dated April 2, 2007 with amendments

C       Declaration of Laura Barlow

D       Summary of Fees/Expenses - April 1, 2007 to November 30, 2008